E-FILED
Friday, 26 December, 2025 06:56:56 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| SHAWN JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>-vs-<br><br>AUSTIN INDUSTRIES, INC., AUSTIN MAINTENANCE AND CONSTRUCTION, INC., and AUSTIN INDUSTRIAL, INC.,<br><br>Defendants. | ) | Case No. 25-cv-2337<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Plaintiff SHAWN JONES, a millwright, brings this suit against his former employers, AUSTIN INDUSTRIES, INC., AUSTIN INDUSTRIAL, INC., and AUSTIN MAINTENANCE AND CONSTRUCTION, INC., (collectively, "Austin") for requiring him to participate in an invasive, unlawful and discriminatory "Wellness Program" or pay a penalty in the form of a fine of $2,400 annually for him and his spouse. Austin's plan, which required the disclosure of medical and genetic information by Mr. Jones and his wife, was not voluntary and thus violates the ADA, GINA and ILGIPA. Mr. Jones refused to participate in this Plan and thus incurred the fines, which Austin did not disclose to him when he accepted the position. The financial hardship caused by these unlawful charges forced him to resign.

2. This is a class action brought on behalf of all current and former employees of Ausutin who are or were required to participate in Austin's Wellness Program or pay a fine between September 21, 20221 and the present (the "Class").

3. The Americans with Disabilities Act ("ADA"), the Genetic Information Nondiscrimination Act ("GINA") and the Illinois Genetic Information Privacy Act ("ILGIPA") prohibit employers from requiring medical or genetic information from employees unless that information is provided voluntarily. Mr. Jones brings this suit to vindicate his rights, and those of similarly situated, and for an order declaring these Plan provisions and penalties unlawful, null and void. He also brings claims individually for his constructive discharge.

## JURISDICTION AND VENUE

4. Plaintiff brings Counts I and II of this case under the ADA, 42 U.S.C. §§ 12101 et seq., and GINA, 42 USCS § 2000ff et seq, and this Court thus has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the related claim in Count III (ILGIPA) pursuant to 28 U.S.C. §1367.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because the Austin facility where Plaintiff worked is domiciled in Decatur, Illinois and the events giving rise to the claim thus occurred in this District.

## PARTIES

6. Defendant AUSTIN MAINTENANCE AND CONSTRUCTION, INC. is a wholly owned subsidiary of Defendant AUSTIN INDUSTRIAL, INC. which is a wholly owned subsidiary of AUSTIN INDUSTRIES, INC. (collectively, "Austin"). Austin provides industrial construction and maintenance services to clients in petrochemical, refining, food and beverage, pulp and paper, power/energy, manufacturing and other industries. Austin has more than 4,000 employees.

7. Shawn Jones was hired by Austin on or about January 26, 2021 for the position of Millwright. His rate of pay was $31.00 per hour. His job involved maintaining and repairing heavy machinery. He was forced to resign on or about April 26, 2023, and his last day of work was on approximately May 5, 2023.

## BACKGROUND

8. Employee wellness programs have become prevalent among large employers that offer health benefits. These programs engage with many different aspects of employee health care such as lifestyle coaching, smoking cessation classes and reward programs for reaching certain health targets.

9. To the extent that wellness programs solicit confidential medical and genetic information, the inquiries or examinations must be "voluntary" under the ADA and GINA.

10. Enacted in 1990, the ADA aims to combat workplace stigma and discrimination against individuals with disabilities. Under the ADA, an employer is prohibited from "requir[ing] a medical

examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

11. The ADA permits a narrow exception to this prohibition against non-job-related medical examinations and inquiries. Employers may make medical inquiries and conduct medical examinations as part of an employee wellness program, so long as those inquiries and examinations are "voluntary." *Id.* § 12112(d)(4)(B). Any non-voluntary inquiry or examination is, in itself, an act of discrimination under the ADA. *Id.* § 12112(d)(1).

12. In 2000, the EEOC promulgated ADA enforcement guidance providing that "[a] wellness program is 'voluntary' as long as an employer neither requires participation nor penalizes employees who do not participate." *EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA), General Principles*, Question 22 (July 27, 2000), https://www.eeoc. gov/policy/docs/ guidance-inquiries.html#10 ("2000 ADA Guidance").

13. In 2008, Congress enacted GINA to combat workplace discrimination based on the genetic information of an employee or his or her family members.

14. Under GINA, "genetic information" includes both information about an employee's genetic tests and those of an employee's "family members" and information about "the manifestation of a disease or disorder in family members," also known as family medical history. 42 U.S.C. § 2000ff(4).

15. To protect employees from discrimination, GINA forbids employers "to request, require, or purchase genetic information with respect to" an employee or his or her family members. *Id.* §2000ff–1(b). GINA defines "family members" as dependents under the Employee Retirement Income Security Act of 1974 ("ERISA"), or those related (up to four degrees) to the employee or dependent. This includes those related through "marriage, birth, or adoption or placement for adoption." Thus, GINA protects from disclosure the medical histories of employees and their family members, regardless of whether those family members are blood relatives.

16. Like the ADA, GINA has a narrow carve-out for the collection of genetic information through an employee wellness program. Under GINA, an employer can request genetic information about an employee or his or her family members when "health or genetic services are offered by the employer, including such services offered as part of a wellness program," but only if "the employee provides prior, knowing, voluntary and written authorization." *Id.*

17. In 2010, the EEOC promulgated regulations implementing GINA. The 2010 GINA Rule forbade employers from exacting any penalties—or applying any incentives—that are conditioned on providing genetic information. 75 Fed. Reg. at 68,912; 29 C.F.R. § 1635.8(b)(2)(i)(A) (2010).

18. Thus, the 2010 GINA Rule expressly forbade any penalties/incentives attached to collecting any statutorily-protected genetic information through an employee wellness program, including spousal medical history. 29 C.F.R. § 1635.8(b)(2)(i)(A) (2010).

19. The GINA regulations also prohibit employers from disclosing genetic information—regardless of how it is collected—with only very limited exceptions, such as consent or court order. 29 C.F.R. § 1635.9.

20. In 2016, the EEOC promulgated new regulations governing employee wellness programs' compliance with the ADA and GINA (the "2016 Rules"). EEOC, Amendment to Regulations Under the Americans with Disabilities Act, Proposed Rule, 80 Fed. Reg. 21,659 (Apr. 20, 2015); EEOC, Genetic Information Nondiscrimination Act of 2008, Proposed Rule, 80 Fed. Reg. 66,853 (Oct. 30, 2015).

21. The 2016 Rules set up a comprehensive framework for addressing wellness program compliance with the ADA and GINA, including protections against using collected information to discriminate, confidentiality instructions, and an explanation of why the ADA's "insurance safe harbor"—a provision excluding underwriting activities from the statute's coverage—does not entirely insulate wellness programs from the ADA's protective ambit.

22. One of the most significant features of the 2016 Rules was the redefining of voluntary participation in an employee wellness program. The EEOC abandoned its longstanding position and

expressly permitted employers to impose financial penalties for non-participation in a wellness program without rendering the wellness program involuntary.

23. Specifically, the 2016 ADA Rule established that exams and inquiries in wellness programs were "voluntary" so long as the "incentive available under the program . . . does not exceed . . . thirty percent of the total cost of [individual] coverage." 29 C.F.R. § 1630.14(d)(3) (2016). In other words, so long as the financial penalty imposed by the employer did not exceed 30% of the insurance premium an individual would pay, the financial penalty did not render participation in the program involuntary.

24. The EEOC also revised the GINA rules on voluntariness and allowed the imposition of financial penalties in the context of spousal medical histories. Under the 2016 GINA Rule, employers could penalize employees for refusing to provide spousal medical histories through Health Reimbursement Arrangements ("HRAs") in employee wellness programs without rendering the wellness program involuntary so long as the penalty did not exceed 30% of the total cost of individual health coverage. 29 C.F.R. § 1635.8(b)(2)(iii) (providing that an employer "may offer an inducement to an employee whose spouse provides information about the spouse's manifestation of disease or disorder as part of a health risk assessment"). In its reasoning, the court noted that the ADA and GINA had more stringent voluntariness requirements than did other statutes that provided safe harbors for certain wellness programs. *Id.*

25. In 2017, the U.S. District Court for the District of Columbia vacated the penalty/incentive provisions of the 2016 Rules as arbitrary and capricious. *AARP v. EEOC*, 292 F. Supp. 3d 238, 240 (D.D.C. 2017), *amending judgment in opinion at* 267 F. Supp. 3d 14 (D.D.C. 2017) (emphasis in original). The court held that the EEOC had not "considered any factors relevant to the financial and economic impact the rule is likely to have on individuals who will be affected by the rule." The court specifically noted that the average 30% penalty—approximately $1,800 per year—"is the equivalent of several months' worth of food for the average family, two months of childcare in most states, and roughly two months' rent." *Id.*, at 32.

26. On December 20, 2018, consistent with the court's order, the EEOC withdrew the "incentive" portions of the 2016 Rules.

27. The remaining portions of the 2016 Rules, including the EEOC's "safe harbor" interpretation, remain in effect. Thus, the statutory "voluntary" provisions and the agency's prior guidance and regulations, including the 2000 ADA Rule and the 2010 GINA Rule on voluntariness, also remain in place.

28. Like GINA, the purpose of the Illinois Genetic Information Privacy Act is to further public health interests by facilitating voluntary and confidential nondiscriminatory use of genetic testing information. 410 ILCS 513/5. It provides *inter alia*: "An employer shall not penalize an employee who does not disclose his or her genetic information or does not choose to participate in a program requiring disclosure of the employee's genetic information." 410 ILCS 513/25.

**SUBSTANTIVE ALLEGATIONS**

29. Austin requires all employees and their spouses who enroll in its health insurance program to either satisfy the requirements of its Wellness Program or pay a "non-wellness" surcharge of $1,200 for the individual employee or $2,400 for the employee and their spouse per annum.

30. The Program is administered by Austin and CIGNA a third-party health services company.

31. To satisfy the Wellness Program requirements, participants must undergo biometric testing, which screens for five risk factors related to waist circumference, blood sugar, blood pressure, triglycerides, and cholesterol. These requirements are not job-related or consistent with business necessity – nothing about Mr. Jones' position as a millwright required these tests.

32. Participants with two or fewer risk factors are not required to pay the non-wellness surcharge. Those with three or more risk factors are deemed "high risk" and are required to either reduce their weight by 5% compared to the prior year or participate in four health coaching calls with CIGNA's Personal Health team.

33. Completing the health coaching calls requires a significant amount of time. Austin's Wellness Program mailer advises: "Don't wait, phone calls can take up to a month to compete." During coaching calls, participants discuss their diet, exercise and health habits with a Cigna health team member. They are advised to establish goals related to diet and exercise.

34. On information and belief, Austin has charged the $1,200 penalty to numerous employees, even after they or their spouse completed the coaching calls.

35. If a Wellness Program participant requires a reasonable accommodation to meet the required outcomes, CIGNA shares the participants' confidential and identifiable health information with Austin. Austin's Benefits guide expressly states the program will disclose this information "as necessary to respond to a request from you for a reasonable accommodation."

36. Austin failed to inform Mr. Jones of the surcharge upon his hiring; to the contrary, his offer letter stated Austin offers "Austin wellness programs at no additional cost to you." Mr. Jones first learned about the penalty via a mailer about the program in or about July 2021. Had he known about the penalty, he would not have accepted the position.

37. Mr. Jones' wife has a preexisting medical condition and would require an accommodation to meet the required outcomes of the program described above. Mr. Jones did not want Austin to know about his wife's private medical history but such a disclosure of his family's medical history would have been required to receive an accommodation, as described above. He thus would be penalized regardless of whether he participated in the program because his wife's medical history could prevent her from meeting the "wellness goals."

38. Mr. Jones repeatedly asked for confirmation regarding the requirements of the program. In or about July 2021, Dana Hunt, Human Resources Generalist, acknowledged that Austin had provided conflicting information about the program and surcharges. She confirmed Mr. Jones and his spouse both needed to complete the biometric screening to avoid paying the non-wellness charge.

39. In or about September 2022, Mr. Chris Hallman from Austin's employee benefits department advised, *inter alia,* that if Mr. Jones enrolled in the medical plan and failed to meet the

requirements of the wellness program, his annual premium would be increased by $1,200, and if his spouse did not meet the requirements, the premium would be increased by an additional $1,200.

40. Mr. Jones chose to protect his and his wife's private medical information from his employer and therefore did not meet the requirements of the wellness program.

41. As a result, in January 2023, Austin began charging Mr. Jones the non-wellness surcharge of $46.15 per week, or $2,400 per year. Mr. Jones incurred these charges through the end of his employment.

42. These charges were significant, and they imposed substantial hardship on Mr. Jones and his family. The charges were effectively a reduction in pay.

43. On or about April 26, 2023, Mr. Jones was forced to submit his resignation because he could not afford to continue working for Austin as a result of these charges and as such was constructively discharged from his employment.

44. The Wellness Program and above described requirements and penalties apply to all employees of Austin Industries. On information and belief, they also apply to all Austin Industrial operating companies as well.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

45. Mr. Jones filed a timely, class-based Charge of Discrimination with the EEOC and the Illinois Department Human Rights & Opportunities on July 18, 2022, alleging that the Austin Wellness Program violates the ADA and GINA.

46. The EEOC issued a Letter of Determination finding reasonable cause to believe that Defendants discriminated against a class of individuals, including the Plaintiff, based on their disability and/or genetic information by denying them the opportunity to opt out of the wellness program without a surcharge, in violation of the ADA and GINA and that Defendant constructively discharged Plaintiff in violation of the ADA and GINA.

47. The EEOC issued its Notice of Right to Sue on September 30, 2025. By filing this federal action within 90 days thereof, Plaintiff has satisfied all administrative prerequisites under the ADA and GINA.

**CLASS ACTION ALLEGATIONS**

48. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 239a), 23(b)(2), and 23(b)(3) on behalf of all current and former Austin employees who are or were required to participate in the Wellness Program or pay a fine between September 21, 2021 and the present, including a subclass of these employees whose spouses were required to participate in the Wellness Program or pay the same fine during that time period. Plaintiff and the class seek declaratory and injunctive relief, lost wages, and non-economic damages.

49. Certification under Federal Rule Of Civil Procedure 23(b)(2) because Austin has acted or refused to act on grounds that apply generally to the class and final injunctive or declaratory relief is appropriate with respect to the class as a whole.

50. Certification under Federal Rule of Civil Procedure 23(b)(3) is appropriate because Plaintiff seeks monetary damages on behalf of class members and because common questions of law and fact predominate over individualized inquiries and a class action is a superior method for adjudication. The Wellness plan and its policies were applied uniformly to all class members.

51. Numerosity: The members of the Class are so numerous that joinder of all members would be impractical. While the exact number of class members is presently unknown, Plaintiff estimates that there were as many as 1,000 class members. The exact number of class members can only be ascertained through appropriate discovery.

52. Commonality. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual class member. For example:

a. Whether Austin’s acts alleged herein violate the ADA;

b. Whether Austin’s acts alleged herein violate GINA;

c. Whether Austin’s acts alleged herein violate IL GIPA;

d. Whether the disclosure of information alleged herein violates the ADA, GINA, and/or IL GIPA;

e. The nature and extent of the class-wide injury and the appropriate measure of damages for the Class; and

f. Whether declaratory/injunctive relief is warranted.

53. Plaintiff's claims arise from the same Wellness Program policy and course of conduct by Austin and his claims are based on the same legal and remedial theories as those of the proposed Class and involve similar factual circumstances. Further the injuries suffered by Plaintiffs are similar to the injuries suffered by the class and Plaintiff seeks common forms of relief for himself and the class, including but not limited to injunctive and declaratory relief, lost wages paid in the form of a penalty, and non-economic damages.

54. Typicality. Plaintiff's claims are typical of the claims of the class members' because all members of the Class are similarly affected by Yale's alleged violations of the ADA, GINA, and IL GIPA that are complained of herein. Plaintiff is affected by the alleged violations in the same manner as other class members. Their right to voluntarily participate in the Wellness Program has been denied by Austin's imposition of a financial penalty for non-participation. As a result, class members have incurred lost wages for non-participation and non-economic damages whether they participate in the Wellness Program against their will or refuse to participate in the Wellness Program's unlawful and discriminatory program requirements.

55. Adequacy. Plaintiff will fairly and adequately protect the interests of class members and have retained counsel competent and experienced in class action litigation and the claims asserted herein.

56. Predominance. Common questions of law and fact predominate over any questions affecting only individual members of the Class. Specifically, questions concerning whether Austin violated the ADA, GINA, and the IL GIPA predominate over any individualized questions.

57. Superiority. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable and individual class members may lack the financial resources to vigorously prosecute this action. Class treatment will obviate the need for unduly duplicative litigation that might result in inconsistent judgments.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE ADA

58. Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

59. Austin is a covered entity under 42 U.S.C. § 12111(2) and § 12111(5)(A) because it is an employer engaged in an industry affecting commerce with 15 or more employees.

60. Austin requires medical examinations and makes inquiries of employees in violation of 42 U.S.C. § 12112(d)(4)(A) and (B) because the inquiries and medical examinations are not "voluntary" components of an employee wellness program as described above.

61. Austin imposes a $46.15 per week fine on those who do not submit to medical inquiries and examinations. This penalty is coercive.

62. Austin's Wellness Program thus violates the ADA.

63. Plaintiff has been damaged as a result of Austin's discriminatory non-voluntary wellness program surcharges as described above.

### COUNT II - VIOLATION OF GINA

64. Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

65. Austin's Wellness Program violates GINA, 42 U.S.C. § 2000ff-1(b), because Austin is an employer requesting, requiring, or purchasing genetic information with respect to an employee or family member of the employee without voluntary authorization from the employee.

66. GINA defines "family members" as dependents under ERISA, or those related (up to four degrees) to the employee or dependent. ERISA permits individuals to claim dependents "through marriage, birth, adoption, or placement for adoption." This includes spouses. Thus, medical information relating to manifested conditions of spouses is the employee's family medical history, which is genetic information under GINA. 29 C.F.R. § 1635.3(a)(1).

67. Austin's reasonable accommodation requirement requests and requires genetic information because it elicits information about the manifestation of a disease or disorder in the employee's family member (e.g. Mr. Jones' spouse) as described above.

68. Austin imposes a $46.15 weekly fine on those who do not submit to the acquisition of genetic information.

69. Its Plan thus violates GINA.

70. Plaintiff and the class have been damaged as a result of Defendants' violation as described above.

**COUNT III – IL GIPA**

71. Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

72. The IL GIPA provides and employer shall not directly or indirectly "solicit, request, require or purchase genetic testing or genetic information of a person or a family member of the person, or administer a genetic test to a person or a family member of the person as a condition of employment, preemployment application, labor organization membership, or licensure." 410 ILCS 513/25(c)(1).

73. The IL GIPA provides an employer shall not directly or indirectly "affect the terms, conditions, or privileges of employment, preemployment application, labor organization membership, or licensure, or terminate the employment, labor organization membership, or licensure of any person because of genetic testing or genetic information with respect to the employee or family member, or information about a request for or the receipt of genetic testing by such employee or family member of such employee." 410 ILCS 513/25.

74. The IL GIPA further provides: "An employer shall not use genetic information or genetic testing in furtherance of a workplace wellness program benefiting employees unless (1) health or genetic services are offered by the employer, (2) the employee provides written authorization in accordance with Section 30 of this Act [410 ILCS 513/30], (3) only the employee or family member if the family member is receiving genetic services and the licensed health care professional or licensed genetic counselor involved in providing such services receive individually identifiable information concerning the results of such services, and (4) any individually identifiable information is only available for purposes of such services and shall not be disclosed to the employer except in aggregate terms that do not disclose the identity of specific employees. An employer shall not penalize an employee who does not disclose his or her genetic information or does not choose to participate in a program requiring disclosure of the employee's genetic information." 410 ILCS 513/25(e).

75. "Genetic information" under the IL GIPA includes: (i) The individual's genetic tests; (ii) The genetic tests of family members of the individual; (iii) *The manifestation of a disease or disorder in family members of such individual*; or (iv) Any request for, or receipt of, genetic services, or participation in clinical research which includes genetic services, by the individual or any family member of the individual. 410 ILCS 513/10; 45 CFR 160.103 (Emphasis supplied).

76. Austin violated the above sections of the IL GIPA by requiring Plaintiff and the class to provide genetic information including information related to their spouses subject to the $46.15 weekly penalty and, ultimately forcing Plaintiff to resign, as set forth above.

77. The IL GIPA provides a private right of action as a supplemental claim in a federal court proceeding. 410 ILCS 513/40.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court:

**a)** certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

**b)** designate Shawn Jones as the representative of the Rule 23 Class and the undersigned as counsel for the Class;

**c)** declare Austin's conduct to be in violation of the ADA, GINA and the IL GIPA;

**d)** enter an injunction prohibiting Austin from continuing to impose a $46.15 per week fine, or any other fine in any other amount, on those who do not meet the disclosure or participation requirements of the Wellness Plan;

**e)** award economic and non-economic damages, including but not limited to the amounts paid in penalties, as well as lost wages;

**f)** award liquidated and punitive damages;

**g)** award expenses, including reasonable attorneys' fees;

**h)** award pre-and post- judgment interest and other penalties as allowable; and

**i)** grant such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

Respectfully Submitted,

*By: /s/ M. Nieves Bolaños*
One of Plaintiff's Attorneys

M. Nieves Bolaños
Patrick J. Cowlin
HAWKS QUINDEL, S.C.
111 East Wacker Drive, Suite 2300
Chicago, IL 60601
(312) 224-2423
mnbolanos@hq-law.com
pcowlin@hq-law.com